FILED

2013 May-09  PM 03:49
U.S. DISTRICT COURT
N.D. OF ALABAMA



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
JASPER DIVISION

| | | |
|---|---|---|
| CHARLES R. OTWELL, SR., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | 6:11-cv-2139-LSC |
| | ) | |
| ALABAMA POWER COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OF OPINION

### I.      Introduction

Before this Court are cross motions for summary judgment: 1) Defendant Alabama Power Company's ("Alabama Power's") Motion for Summary Judgment as to all of Plaintiffs' claims, filed on December 12, 2012 (Doc. 81), and 2) Plaintiffs' Motion for Partial Summary Judgment as to Count One of their Second Amended Complaint (Action for Declaratory Judgment of Riparian Rights), filed on January 17, 2013. (Doc. 89.) The motions are fully briefed and are now ripe for decision. Upon full consideration of the legal arguments and evidence presented, Alabama Power's Motion for Summary Judgment will be granted, and Plaintiffs' Cross Motion for

Partial Summary Judgment will be denied.[1]

## II.    Background Facts[2] and Procedural History

### 1.    *Alabama Power's Federal Licensing and Development of Smith Dam*

Alabama Power is an electric public utility engaged in the manufacture, supply and sale to the public of electricity in the State of Alabama, including electricity produced by water at hydroelectric power dams. In 1956, Alabama Power filed an application with the Federal Power Commission ("FPC"), the predecessor agency to the Federal Energy Regulatory Commission (the "FERC"), for a license under the Federal Power Act ("FPA") for the Warrior River Project ("the Project"). The Project includes the Lewis Smith development, located in north central Alabama in

---

[1] Also before the Court are several evidentiary-related motions. Plaintiffs filed a motion to strike Alabama Power's statement of undisputed facts and certain affidavits used in support of its motion for summary judgment (Doc. 98), to which Alabama Power has responded (Doc. 109). Plaintiffs also filed a motion to strike the second affidavit of William Edge submitted in support of Alabama Power's brief in opposition to Plaintiffs' cross motion for summary judgment (Doc. 118), to which Alabama Power has responded (Doc. 120). Within said response, Alabama Power included a motion for leave to file a corrected third affidavit of William Edge. (*Id.*) Plaintiffs have replied in support of the motion to strike and have responded to the motion to file the corrected affidavit. (Doc. 123.) Each of these motions will be addressed by the Court herein.

[2] The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the Court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party on each motion. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

the headwaters of the Black Warrior River on the Sipsey Fork in Cullman, Walker, and Winston counties. The Lewis Smith development consists of a 300-foot-high, earth and rock fill dam ("Smith Dam"); a 35-mile-long, 21,200 acre reservoir impounded by construction of the dam ("Smith Lake"), and a hydroelectric power house. The FPC issued a fifty-year license to Alabama Power for the Project effective September 1, 1957 (the "1957 License"). The license required the Project to be operated for flood control and hydroelectric power generation. Specifically, Smith Dam was to provide hydroelectric power storage between elevations of 488 to 510 feet above mean sea level ("msl"), flood control storage between elevations of 510 and 522 msl, and flood control surcharge between elevations of 522 and 540 msl. The 1957 License provided for flood control operations in accordance with certain specified conditions to be implemented by a Reservoir Regulation Manual ("the Manual") to be prepared by the U.S. Army Corps of Engineers (the "Corps"). In issuing the 1957 License, the FPC found the Project "desirable and justified in the public interest" and stated:

> The project is best adapted to a comprehensive plan for improving and developing the Sipsey Fork of the Black Warrior River and the Black Warrior River for the use and benefit of interstate or foreign commerce, for the improvement and utilization of water-power development, and for other beneficial public uses, including recreational purposes.

(Doc. 83-1, ¶ 10.)

2.      *Alabama Power's Acquisition of the Project Property*

Pursuant to the 1957 License, Alabama Power was obligated to acquire the project lands required for the dam site and reservoir, the dam, power houses, and related equipment, and "all riparian or other rights, the use or possession of which is necessary or appropriate in the maintenance and operation of the project." (Doc. 83-1, at 194-98.) Upon purchase of the dam site, Alabama Power was authorized by Alabama law "[t]o acquire by condemnation the lands and rights necessary for the construction and operation of the dam and works connected therewith or useful thereto, either up or downstream therefrom" and "all lands, waters, interests, rights, or easements in lands or waters likely to be flooded or damaged by impounding or diverting the water of any watercourse in this state . . . ." (Doc. 83-4, at 3-4, ¶¶ 3-5.) Pursuant to this authority, Alabama Power either by negotiated purchase or condemnation acquired the property necessary to own and operate the Project, which was the property of the former owners in and to the portion of the real property lying below elevation 510 msl and by easement the right to inundate from time to time lands lying between 510 and 522 msl.

Plaintiffs Charles and Judy Otwell ("the Otwells") own a subdivision lot on Smith Lake in Walker County, Alabama, which they purchased in 1986. The Otwells'

lot is part of a parcel of land that Alabama Power obtained from John E. Gaddy and his wife by purchase in 1958. The Gaddy deed to Alabama Power provides that the land between elevations of 510 and 522 msl is encumbered by an easement, and the land below the elevation of 510 is owned in fee by Alabama Power.[3]

Plaintiff David Billings owns a lot on Smith lake described as 0.34 acres in Cullman County, Alabama. Billings' lot was part of a parcel of land that Alabama Power obtained from E.C. Harris and his wife by purchase in 1958. The Harris deed to Alabama Power also provides that the land between elevations of 510 and 522 msl is encumbered by an easement, and the land below the elevation of 510 is owned in fee by Alabama Power.[4]

The conveyances executed by the predecessors in title to the Otwells' and Billings' properties also included an exculpatory covenant for future operation of Smith Dam for the manufacture of electricity. (Doc. 83-4, ¶¶ 11, 13.)

Plaintiff KHFW, LLC is a real estate development company owned by Jared

---

[3]  The original property that contained the Otwells' lot was not adjacent to the Sipsey Fork of the Black Warrior River. However, a portion of a tributary of the Sipsey Fork, known as Battle Branch, was located on that property below elevation 510 msl. Alabama Power purchased the portion of Battle Branch located on that property.

[4]  The original property that included Billings' lot was not adjacent to the Sipsey Fork of the Warrior River. However, a portion of a tributary of the Sipsey Fork, known as Ryan Creek, was located on that property below elevation 510 msl. Alabama Power purchased the portion of Ryan Creek located on that property.

Key, a former plaintiff in this case, and others. In 2006, KHFW, LLC acquired property on Smith Lake consisting of approximately 22.17 acres in Winston County, Alabama. The property now owned by KHFW, LLC was part of a much larger parcel which Alabama Power obtained by condemnation from the Grief Brothers Cooperage Corporation, consisting of 203 acres.[5] Alabama Power's condemnation proceedings for this parcel provided that the land was being acquired in order to operate a dam for the manufacture of electricity, that the land between elevations 510 and 522 msl would be encumbered by an easement, and the land below elevation 510 would be owned in fee by Alabama Power. The final condemnation order entered on September 6, 1958, granted to Alabama Power "the right to take, use and hold the lands and waters . . . for the purpose of covering with water, and flooding . . . in connection with the construction and operation of Lewis M. Smith Dam for the manufacture, supply and sale to the public of electric power . . . ." (Doc. 83-4, ¶ 15.)

3.    *The Corps Reservoir Regulation Manual and Operations*

Filling of Smith Lake commenced in 1960, minimum power pool elevations were reached in 1961, and commercial operation of Smith Dam began in September

---

[5] As with the other parcels, that parcel was not adjacent to the Sipsey Fork of the Warrior River. However, a portion of Farley Branch was located on the property below elevation 510 msl. Farley Branch was an intermittent stream, which was a tributary to Brushy Creek, which is a tributary to the Sipsey Fork. Alabama Power purchased the portion of Farley Branch located on this property.

1961. As specified in the 1957 License, the Corps developed, in cooperation with Alabama Power, a Manual which describes, among other things, Alabama Power's normal operation of Smith Lake and the procedure Alabama Power must use to operate the lake in a flood event. The Manual generally describes the Project as "a storage project constructed for the purpose of providing reservoir capacity for the generation of hydro-electric power and for flood control. It will normally be operated as a peaking plant to help meet load demands on the Alabama Power Company's system in the State of Alabama." (Doc. 83-1, ¶ 13.)[6]

The Manual also contains a guide curve or chart for power operation, illustrating the projected elevation of Smith Lake during normal operations by day of the year. The guide curve describes the probable range of drawdown of the lake waters as a band between elevations 488 and 496 msl from December to January, rising to between 506 and 510 msl by April and continuing in May, then gradually falling beginning in June until the reservoir reaches the 488 to 496 msl level by December 1. The "principle objective" in the development of these guide curves by Alabama Power and the Corps was to fill the reservoir during the early spring months to

---

[6] At a peaking plant, the hydroelectric dam is run only during the hours of highest energy demand and is used to offset the cost of providing energy from other, more expensive, sources. Hydroelectric plants are ideally suited to meet peak demands because they require very little startup and shutdown time and can be turned on and off to follow the demand for energy.

provide maximum hydroelectric energy during the peak season months ( June through September), during which time the reservoir was drawn down to achieve minimum winter pool elevations by December 1.

Plaintiffs contend that the evidence submitted by Alabama Power shows that it has not always operated Smith Dam in accordance with the Corps' Manual's guide curves. Alabama Power submitted charts showing the elevation of Smith Lake for each year from 1961 to 2012. These charts show that the high and low elevations vary greatly from year to year based on precipitation, inflow and other factors, but that generally the reservoir level was maintained within the guide curves. In any event, the FERC has recognized that Alabama Power had discretion under the 1957 License to operate the Project "to best suit the system requirements" between the minimum power pool elevations of the lower guide curve and the top of the power pool at elevation 510 msl, as follows:

> The chart referred to in the above-quoted text (Chart 8: Guide Curves and Rules of Project Operation) "shows guide curves for power operation which indicate the probable range of drawdown." Unlike many cases involving guide curves, where the licensee would be required to operate within the band established by the curves, there was no requirement in the [1957 License] to operate within the guide curves. The only operating requirements were for flood control and navigation. . . . So long as Alabama Power met those two sets of requirements [flood control and navigation], it could operate the Smith development to best suit system requirements to obtain maximum energy generation from

water available *and did not have to maintain specified lake elevations.*
(Doc. 83-1, ¶ 32.) (emphasis added).

Concerning recreation, the Manual states: "Development for purely recreational purposes is not included among the project features. However, many recreational advantages are inherent in an impoundment of this nature, and special attention has been given to the encouragement of recreational aspects where they do not conflict with major project purposes." (Doc. 83-1, ¶ 14.)

### 4.    *Smith-Gorgas Coordination*

The William Crawford Gorgas Electric Generating Plant ("Plant Gorgas") is located on the Mulberry Fork of the Black Warrior River downstream of Smith Dam and has been in operation since 1917.[7] Plant Gorgas produces electricity by burning coal in a boiler to turn water into steam. Under high pressure, the steam turns the blades of a turbine that spins a generator, producing electricity. The plant withdraws cooling water to condense the steam that exits the turbine generators.  As a general matter, as the temperature of the cooling water decreases, the efficiency of the turbine operation increases. Plant Gorgas has always withdrawn cooling water from the Black Warrior River to condense the steam that exits the turbine generators, and the current

---

[7] The Sipsey Fork, on which Smith Lake is located, flows into the Mulberry Fork upstream of Plant Gorgas.

cooling water intake structure has been in place since the late 1950s.

In conjunction with Alabama Power obtaining its FPC License for the Project, the Alabama Public Service Commission ("APSC") issued Alabama Power a Certificate of Convenience and Necessity for the construction of the Project which specifically found that "[t]he construction of the proposed dam on the Sipsey Fork upstream from Gorgas will have the effect of making available great quantities of cooling water for use at Gorgas, both in the Company's present generating plants there and in other generating units which may be added in the future at the Gorgas location." (Doc. 83-1, ¶ 8.)

Since 1974, in a process now known as "Smith-Gorgas Coordination," releases from Smith Dam supply cold water from Smith Lake to downstream Plant Gorgas for use in once-through cooling during the months of May through October. In a plant with once-through cooling, like Plant Gorgas, the cooling water is withdrawn from the source, passes through the condenser and returns immediately back to the source at a higher temperature. In contrast, in closed-cycle cooling systems, cooling water re-circulates continuously between the condenser and a cooling tower.[8] Though water

---

[8] Cooling towers are heat removal devices used to transfer process waste heat to the atmosphere, often installed at power plants to remove the heat absorbed in the circulating water systems used in such plants.

is re-circulated and reused in these systems, additional water is regularly withdrawn from the river or other source to make up for evaporative and other losses inherent in a closed-cycle system.  Smith-Gorgas coordination typically requires releases from Smith Dam five days per week for five or six hours per day.

There are state and federal thermal limits on discharges from power plants such as Plant Gorgas, including National Pollutant Discharge Elimination System ("NPDES") thermal permit limits. Alabama Power's studies in the early 1970s of Smith Lake concluded that the coordination of cold water releases from hydro generation at Smith Dam with cooling water needs at Plant Gorgas—Smith-Gorgas Coordination—offered a good means to ensure thermal permit limit compliance and plant operating efficiencies, while meeting other downstream interests including recreation, municipal and industrial water supply, navigation, and downstream water quality. Operating experience has shown that normal peaking power generation at Smith Dam during the June through September period provides sufficient cooling water to ensure both efficient operation of Plant Gorgas and compliance with the NPDES thermal permit limits.

Alabama Power states that for more than 30 years, the ability to coordinate Smith Dam's power generation releases with Plant Gorgas's once-through cooling

needs has saved the cost of constructing and operating an alternative cooling system at Plant Gorgas, such as cooling towers. Plaintiffs, on the other hand, dispute that Alabama Power operates Smith Dam as a peaking facility, and instead contend that the amount of water released from Smith Lake is determined primarily by the need for cooling water at Plant Gorgas.

### 5.   *Alabama Power's Federal Relicensing of Smith Dam*

In 2000, in anticipation of the expiration of the 1957 License, Alabama Power began the public process of relicensing the Project, including Smith Dam. To issue a license, the FPA requires that the FERC balance numerous, sometimes competing, interests and benefits. *See* 16 U.S.C. §§ 797(e), 803(a)(1). Accordingly, the relicensing process involved numerous stakeholders, including federal and state agencies, and various individuals and groups representing interests both above and below Smith Dam.

On July 28, 2005, Alabama Power submitted an application to the FERC for a new license for the Project based on a consensus proposal. The application sought continued operation of the Project as a "multi-purpose storage reservoir" providing the benefits of "hydroelectric generation, flood control, navigation flow augmentation, maintenance of downstream water quality, municipal and industrial water supply,

recreational opportunities, and serves as habitat for fish and wildlife." (Doc. 83-1, ¶ 22.) The application also provided that the Project "will continue to normally operate to produce peaking power" and that "no change in the Rule Curve . . . is needed." (*Id.*) Smith-Gorgas Coordination was also described in the FERC application. (*Id.*)

After Alabama Power's application was filed with the FERC, the Smith Lake Improvement & Stakeholders Association ("SLISA"), a group self-described as "a non-profit organization representing more than 3,000 property owners and other interested parties in and around Smith Lake," submitted information during the FERC's consideration of the license application and requested that the FERC change the manner in which Alabama Power operates Smith Dam by requiring limited fluctuations of the water level at Smith Lake and by requiring the construction of cooling towers at Plant Gorgas. Former plaintiff Jared Key, the organizer of SLISA, and Plaintiff Billings attended SLISA meetings. Billings also participated in the FERC relicensing proceeding by submitting an affidavit and calling the FERC more than a dozen times.[9]

SLISA's proposal was strongly opposed by a number of entities with

---

[9] Key was SLISA's corporate representative during the SLISA deposition in this case. As he explained in his deposition, "[i]t's a fine line here between me, SLISA, the Plaintiff and the organization." (Doc. 83-9, at 124.) According to Billings, the issues he is pursuing in this case are the same issues he presented to the FERC during the relicensing proceeding. (Doc. 83-8, at 226-27.)

downstream interests. For example, the Corps supported Alabama Power's relicensing application and was concerned that SLISA's proposal would negatively impact navigation. The Corps submitted comments to the FERC on April 8, 2008, concerning the importance of releases from Smith Dam to downstream commercial navigation:

> The BWT [Black Warrior and Tombigbee Waterway] is one of the busiest commercial waterways in the nation with over 21 million tons of commodities shipped annually, including products for export through the Port of Mobile, providing vital support to the nation's balance of trade. . . . No change in current operating practices or establishment of minimum surface elevations at Smith Lake should be considered without first fully considering the potential physical and economic impacts to commercial navigation on the BWT. . . . However, it should be noted that such impacts are not limited to navigation; limited flows due to management of Smith Lake also have the potential to impact downstream municipal and industrial water supply, recreation, and water quality.

(Doc. 83-1, ¶ 25.) Other commenters before the FERC that were critical of SLISA's proposal included the Warrior-Tombigbee Waterway Association,[10] Alabama State Port Authority, Tuscaloosa County Commission, Birmingham City Council,

---

[10]   The Warrior Tombigbee Waterway Association ("WTWA") is an organization that fosters economic growth on the waterway. Its members include municipalities, economic development organizations and other operators who view the waterway as vital to their business, such as Parker Towing, Hunt Refinery, and Nucor Steel. WTWA was active in the FERC relicensing proceeding because its members wanted to ensure that a stable channel depth is maintained, and thus, WTWA objected to SLISA's position and advocated that Alabama Power continue to operate Smith Dam as it had prior to filing the relicensing application.

Tuscaloosa City Council, Birmingham Water Works Board, United Mine Workers of America, Alabama Coal Association, Birmingham Regional Chamber of Commerce, West Alabama Chamber of Commerce, Tuscaloosa County Industrial Development Authority, and PowerSouth Energy Cooperative.

On June 2, 2008, the FERC asked Alabama Power to provide information concerning the impact that implementation of SLISA's proposals would have on various resources. Alabama Power's response included a screening level estimate for converting Plant Gorgas from once-through cooling to closed-cycle cooling. Based on the estimate, Alabama Power advised the FERC, among other things, that the cost of building cooling towers would exceed $300 million.

On March 2, 2009, the FERC issued its Final Environmental Assessment (the "EA") for the Project. In the EA, FERC staff discussed at length and rejected SLISA's contentions. (*See* Doc. 83-1, ¶ 28, Exhibit V.) The EA specifically found that Smith-Gorgas Coordination "has helped [Alabama Power] meet NPDES permit requirements and saved the cost of construction and operation of an alternative cooling system at Plant Gorgas," and that "the lake level is influenced by a combination of factors that include the generation requirements at the Smith development, coordinating operation with the Corps for purposes of navigation,

municipal water withdrawals, enhancement of fish spawning habitat in the lake, recreation, and natural variation in precipitation." (*Id.*) In the same document, the FERC expressly found that SLISA's recommendations, including cooling towers at Plant Gorgas "would not contribute to the best comprehensive use of the Black Warrior River water resources," that the alleged "benefits, (such as increased recreation, revenues from recreation, property values, and tax base) are speculative," and that "the costs of [SLISA's] alternative outweigh the benefits, and it is not in the overall public interest to adopt this measure." (*Id.*)

On March 31, 2010, the FERC issued an order granting Alabama Power's request to continue the Project for an additional thirty years (the "2010 License"). (*See* Doc. 83-2, Exhibit W.) In issuing the 2010 License, the FERC approved the findings made in the EA and expressly rejected SLISA's requests for a different lake water level guide curve and for cooling towers at Plant Gorgas. After reviewing the record, the FERC found that "the operation recommended by [SLISA] would be excessively costly and provide speculative benefits which may never be realized." The FERC approved Alabama Power's proposed operation of the Project "because it provides for the comprehensive use of multiple competing resources within the Warrior River and downstream river basins." As required by the FPA, the FERC

found that Alabama Power's proposed Project operations were:

> best adapted to a comprehensive plan for improving or developing a waterway or waterways for the use or benefit of interstate or foreign commerce; for the improvement and utilization of waterpower development; for the adequate protection, mitigation, and enhancement of fish and wildlife; and for other beneficial public uses, including irrigation, flood control, water supply, recreation, and other purposes.

(*Id.*)

On April 30, 2010, SLISA requested rehearing to challenge the 2010 License. SLISA asked the FERC to reconsider its decision rejecting SLISA's request that the FERC set a different Smith Lake water level guide curve, and once again requested the FERC to require the construction of cooling towers for Plant Gorgas. (*See* Doc. 83-2, Exhibit Y.)

The FERC denied SLISA's rehearing petition by order issued November 15, 2012 ("Rehearing Order"). The Rehearing Order, in again rejecting SLISA's request for minimal fluctuation of Smith Lake, described and approved Alabama Power's discretion to operate the Project within the 488 to 510 msl power pool specified by the FERC License and the Manual, so long as Alabama Power met flood control and navigation flow requirements. (Doc. 83-2, Exhibit Z.) Additionally, in the Rehearing Order, the FERC again specifically found that SLISA's proposed rule curve and plan for more stable water levels was not in the public interest, writing that

"[i]mplementing the operation recommended by the Lake Association could increase private and commercial development around the lake and lengthen the recreation boating season, but this would be costly in terms of lost peak generation." (*Id.*) The Rehearing Order specifically found "that [SLISA's] interests have not been infringed upon or harmed." (*Id.*)

6.    *The Present Lawsuit*

On May 11, 2011, while SLISA was awaiting rehearing on its challenge to the 2010 FERC License, Plaintiffs filed this action, on behalf of a purported class generally described as "owners, lessees, and licensees" of properties on Smith Lake, against Alabama Power in the Circuit Court of Walker County, Alabama. Thereafter, Alabama Power timely removed the action to this Court. Plaintiffs' second amended complaint seeks declaratory and injunctive relief, as well as money damages, due to Alabama Power's alleged misuse of waters and property surrounding the Lewis Smith development at Smith Lake.[11] Plaintiffs allege generally that they have riparian rights in the waters of Smith Lake and that these rights are violated, and other torts result, when Alabama Power "unreasonably releases large flows of water from Smith Lake

---

[11]  Plaintiffs twice amended their complaint, first to dismiss Plaintiff Jared Key and later to dismiss their claims for violation and misuse of easements, trespass, and action to reform conveyance. These three claims were related to Plaintiffs' original allegations that Alabama Power was misusing flood easements to Plaintiffs' properties lying between 510 and 522 datum planes by allowing water levels to be too high at certain times.

to cool the Gorgas discharge," resulting in a water level too far below the 510 msl shoreline contour. (Doc. 96-1, ¶ 24.) Plaintiffs also allege that Alabama Power is unreasonably lowering lake levels in order to avoid building cooling towers at Plant Gorgas (*Id.*) Plaintiffs' claims are as follows: I) Action for Declaratory Judgment of Riparian Rights, II) Unlawful Taking and Violation of Riparian Rights, III) Private Nuisance, IV) Unjust Enrichment, V) Action for Constructive Trust, VI) Action for Injunctive Relief (to require Alabama Power to construct appropriate and effective cooling towers at Plant Gorgas), and VII) Wantonness.

After an agreed-upon period of discovery, the now-pending summary judgment motions were filed. The Court also granted Plaintiffs leave to file a motion for class certification after the motions for summary judgment are ruled upon, should Plaintiffs' claims survive summary judgment.

## III.   Analysis of Plaintiffs' Motion to Strike[12]

---

[12] The Court's analysis in this section does not pertain to Plaintiffs' motion to strike the second affidavit of William Edge submitted in support of Alabama Power's brief in opposition to Plaintiffs' cross motion for summary judgment, (Doc. 118), or Alabama Power's response thereto, in which it sought to file a corrected third affidavit of William Edge. (Doc. 120.)  This is because the issues inherent in that evidentiary dispute, the gist of which concerns whether the Sipsey Fork was navigable at the point where Smith Dam was constructed in the late 1950s, are not relevant to the Court's disposition of the motions for summary judgment.  The question of the navigability of the Sipsey Fork goes to whether Plaintiffs possess riparian rights in Smith Lake under Alabama law, an issue that the Court holds need not be decided in order to resolve the controversy between the parties, *see* section IV.B, *infra*.  As such, both Plaintiffs' motion to strike William Edge's second affidavit (Doc. 118), and Alabama Power's motion to submit a corrected third affidavit of William Edge (Doc. 120) are due to be denied as moot without further discussion.

Before addressing the cross motions for summary judgment, the Court will discuss Plaintiffs' motion to strike Alabama Power's statement of facts and two affidavits submitted in support of Alabama Power's motion for summary judgment. (Doc. 98.) Plaintiffs state that they could not effectively respond to Alabama Power's statement of facts because Alabama Power failed to provide a specific reference to the portions of its evidentiary submission that supported certain factual contentions. Plaintiffs refer to 23 paragraphs in Alabama Power's statement of facts that are allegedly deficient.

Alabama Power's factual statement consists of 56 separately-numbered paragraphs, and each paragraph contains a specific citation to the portion of Alabama Power's evidentiary submission supporting the factual statements in each paragraph. Relying on the instructions set out in this Court's Uniform Initial Order, Plaintiffs apparently contend that Alabama Power should have provided a citation at the end of each sentence in the separately-numbered paragraphs rather than at the end of each paragraph. The Court need not decide whether Plaintiffs' interpretation of the Uniform Initial Order is correct because Alabama Power submitted a response to Plaintiffs' motion containing a chart of the 23 paragraphs identified by Plaintiffs as deficient, along with revised citations in the form described in Plaintiffs' motion. As

such, Plaintiffs' motion, insofar as it pertains to the argument that Alabama Power's statement of facts is deficient, is due to be denied as moot.

In the same motion, Plaintiffs move to strike certain affidavits used in support of Alabama Power's motion for summary judgment. The affidavits in question are those of two of Alabama Power's corporate representatives: James Crew, a Hydro Services Manager for Alabama Power's sister company Southern Company Services, Inc., and William Edge, a Land Supervisor over Shoreline Operations for Alabama Power's Corporate Real Estate Department. According to Plaintiffs, each of these individuals pled ignorance or deferred to other employees within the company when asked certain questions during their depositions, but they each later "unequivocally fill[ed] in the gaps and assert[ed] responses in their affidavits to previously unanswered questions." (Doc. 98 at 6.) Plaintiffs also argue generally that Alabama Power did not produce Federal Rule of Civil Procedure 30(b)(6) witnesses who could answer questions within the scope of their deposition notices.

The Eleventh Circuit bars "sham affidavits" as a means to support or overcome a motion for summary judgment. *Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657-58 (11th Cir. 1984). Sham affidavits "contradict[], without explanation, previously given clear testimony" to "unambiguous questions." Only an affidavit that

is "inherently irreconcilable" with earlier testimony should be stricken. *Tippens v. Celotex Corp.*, 805 F.2d 949, 954 n.6 (11th Cir. 1986). If the affidavit merely "supplements earlier testimony, presents a variation of testimony or represents instances of failed memory," it should be considered. *Croom v. Balkwill*, 672 F. Supp. 2d 1280, 1285 (M.D. Fla. 2009).

Plaintiffs' argument with regard to James Crew's affidavit is that he testified that he did not have specific knowledge about how or why the Corps developed the guide curve for Alabama Power's operation of Smith Lake as it did, but in his affidavit, Crew "relied heavily" on the guide curve, discussing the "principal objective" of the guide curve and Alabama Power's compliance with it.  (Doc. 98, at 9.)

Crew testified as a Rule 30(b)(6) representative for three topics contained in Plaintiffs' Rule 30(b)(6) Notice and Amended Rule 30(b)(6) Notice. The first topic was "[d]ocuments in the custody or control of Alabama Power relating or referring to the Guide Curve or Rule Curve created, developed or established by Alabama Power for Smith Lake." Alabama Power objected to the overly broad nature of this topic, but stated that it had "produced the 1957 License for the Warrior River Project No. 2165; the application for the 1957 License; the 2010 License for the Warrior River Project No. 2165; the 2005 application for the License; and the U.S. Army Corps of

Engineers Reservoir Regulation Manual for the Lewis M. Smith Reservoir" and would provide a representative with knowledge of those specific documents. (Doc. 109, at 8.)

During Crew's deposition, Plaintiffs' counsel asked several questions concerning how the guide curve was created in the 1950s. Alabama Power argues that these questions were beyond the scope of request for "documents . . . relating or referring to the Guide Curve . . ." In any event, Crew testified that while he was not present when the guide curve was developed in the 1950s, it was his understanding that when guide curves are developed, an engineering analysis takes place which includes many factors such as the drainage basin area, the topography of the area, projected inflows, anticipated power needs, navigation requirements, and flood control requirements. (Doc. 98-2, at 17.) Additionally, after Crew's deposition, Plaintiffs requested, and Alabama Power produced, any historic documents related to the creation of the guide curve in the 1950s, and Exhibit M to Crew's affidavit is one of the documents that was produced. Plaintiffs never requested to redepose Crew or any other Alabama Power representative about any of those documents.

Further, an examination of paragraphs 13 to 18 of Crew's affidavit, the paragraphs that Plaintiffs take issue with, reveals that Crew's affidavit is simply

quoting and summarizing specific parts of the Corps Manual and two other documents that are attached as exhibits to the affidavit, including the historic document produced to Plaintiffs after Crew's deposition. As such, it cannot be said that Crew's affidavit is "inherently irreconcilable" with his earlier testimony, *see Tippens*, 805 F.2d at 954 n.6, especially when he was merely quoting from documents in Plaintiffs' possession.

Plaintiffs also argue that during his deposition, Crew disavowed any information relating to Alabama Power's response to the FERC's request for additional information regarding the installation of a closed-cycle cooling system at Plant Gorgas, instead deferring to another employee, David Maxwell ("Maxwell"). In his later affidavit, Plaintiffs say that Crew specifically addressed the costs and consequences associated with installing a closed-cycle cooling system.

The Rule 30(b)(6) topic for which Crew was designated on this issue was "[a]ny studies or investigations done of building cooling towers for use at the Gorgas Plant." Alabama Power objected to the overly broad nature of this topic, but agreed to provide an individual "with knowledge for the time period of May 11, 2005 to May 11, 2011 . . . ."

Contrary to Plaintiffs' assertion, Crew, in his deposition, did not disavow

having any knowledge about Alabama Power's response to the FERC's request for additional information regarding the installation of a closed-cycle cooling system at Plant Gorgas. Rather, he testified that he was the "point person" at Alabama Power to respond to the FERC's request for information, and that as a result of the request, "[W]e specifically asked David [Maxwell] to prepare a conceptual cost estimate for construction of the cooling towers at Gorgas." (Doc. 98-2, at 39, 55.) He further described portions of Maxwell's report. (*Id.* at 39-40.) While it is clear that engineer Maxwell performed the design calculations at Crew's request, Crew, as the individual in charge of providing the complete response to the FERC, was competent to provide testimony about Alabama Power's response. In any event, Plaintiffs' counsel never asked to depose Maxwell.

Later, in his affidavit, Crew merely recites that the FERC asked Alabama Power to provide information concerning certain proposals made by SLISA, attaches a copy of the FERC's request, and quotes from the response, also attached. (Doc. 83-1, ¶ 27.) The Court finds that there are no inherent inconsistencies between Crew's affidavit and his deposition testimony, but rather, that Crew's affidavit merely supplements earlier testimony. *See Croom,* 672 F. Supp. 2d at 1285. As such, Plaintiffs' motion to

strike, insofar as it pertains to James Crew's affidavit, is due to be denied.[13]

## IV.    Analysis of Cross Motions for Summary Judgment

### A.    Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the evidence] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-23. In evaluating the arguments of the movant, the court must view the evidence in the light most favorable to the nonmoving party. *Mize v.*

---

[13]   As noted, Plaintiffs also find fault with William Edge's affidavit in this motion to strike, arguing that he first testified that he did not know who owned the streambed lying underneath Smith Lake, but that later, in his affidavit, he contends that Alabama Power, and not the State of Alabama, owns the streambed. As will become evident herein, this evidence is not relevant to the Court's disposition of the cross motions for summary judgment.  In other words, even if the Court were to adopt Plaintiffs' position on this issue—which is that the State of Alabama owns the streambed underneath Smith Lake—summary judgment would still be due to be granted in favor of Alabama Power for the reasons stated in section IV.C., *infra*.  As such, Plaintiffs' motion to strike, insofar as it pertains to William Edge's affidavit, is due to be denied as moot.

*Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

Once the moving party has met his burden, Rule 56 "requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotations omitted); *see also* Fed. R. Civ. P. 56(c). "A factual dispute is genuine only if a 'reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp.*, 281 F.3d at 1224 (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991)).

### B.    Plaintiffs' Motion for Partial Summary Judgment

Plaintiffs seek summary judgment on the declaratory judgment count of their complaint, requesting that the Court declare that they have riparian rights in Smith Lake as a matter of law. For the reasons that follow, Plaintiffs' motion for summary judgment is due to be denied.

Alabama law has defined riparian rights as the rights enjoyed by owners of lands abutting watercourses. *Mobile Trans. Co. v. City of Mobile*, 30 So. 645, 646 (Ala. 1900), *overruled on other grounds.*[14] The basic concept of a riparian right is the right of an

---

[14] At common law, the term "riparian rights" referred to the rights of owners of land abutting a stream, while the term "littoral rights" referred to the rights of owners of land abutting the surface

owner of land abutting a waterbody to extract, use, and enjoy water from that waterbody on the adjoining riparian land. *See* 1 Waters and Water Rights § 6.01(a) (Amy L. Kelley, ed., 3d ed. LexisNexis/Matthew Bender 2011). Each abutting landowner has an equal and correlative right to make reasonable use of the water. *Id.* In other words, a riparian right is a right to use and enjoy the water, subject to the rights of other riparian owners to do the same.

The parties have submitted hundreds of pages of briefing and evidence devoted to whether Plaintiffs have riparian rights in Smith Lake. This is presumably because Plaintiffs concede that if they do not have riparian rights, they have no claim for which this Court could grant relief. (*See* Plaintiffs' Reply Brief, Doc. 116, at 9.) However, Plaintiffs' request for a declaration is due to be denied because it will not resolve the dispute that is directly before the Court on Alabama Power's motion for summary judgment and thus, any declaration made by this Court would be merely advisory.

A district court has broad discretion to decide whether to render a declaratory judgment. *See Wilton v. Seven Falls Co.*, 515 U.S. 277, 278 (1995) ("Since its inception, the Declaratory Judgment Act has been understood to confer on federal courts unique

---

waters of a lake or the sea, but courts now commonly use the word "riparian" when describing water rights in either context. *Wehby v. Turpin*, 710 So. 2d 1243, 1246 n.2 (Ala. 1998) (internal citation omitted).

and substantial discretion in deciding whether to declare the rights of litigants. On its face, the statute provides that a court '*may* declare the rights and other legal relations of any interested party seeking such declaration.'"). The Supreme Court further stated:

> Consistent with the nonobligatory nature of the remedy, a district court is authorized, in the sound exercise of its discretion, to stay or to dismiss an action seeking a declaratory judgment before trial or after all arguments have drawn to a close. In the declaratory judgment context, the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise judicial administration.

*Id.* at 288.

The two principal criteria guiding the policy in favor of rendering declaratory judgments are 1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue; and 2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding. 10B Wright, Miller & Kane, Federal Practice & Procedure: Civil 3d § 2759 (1998). For the reasons that follow, the Court finds that neither of these criteria is met here.

The Court deems it unnecessary to issue an abstract ruling on whether Plaintiffs have riparian rights in Smith Lake because such a ruling will not resolve the dispute that is squarely before the Court on Alabama Power's motion for summary judgment;

*i.e.*, whether Alabama Power's operation of Smith Dam under its 1957 and 2010 FERC Licenses and the Corps Manual is a reasonable use of its own riparian rights such that Plaintiffs' state-law tort causes of action cannot be maintained. *See In re Orion Pictures Corp.*, 4 F.3d 1095, 1100 (2nd Cir. 1993) ("Where a district court has before it a declaratory judgment action and a direct action containing all of the issues in the declaratory judgment action, and decides the common issues in the direct action, it may exercise its discretion to dismiss the declaratory judgment complaint."). As will be discussed in section IV.C., *infra*, even if Plaintiffs do have riparian rights in Smith Lake, Alabama Power has not violated any such rights, and thus all of Plaintiffs' claims, which are all based upon an alleged violation of riparian rights, are due to be dismissed. Thus, the Court, in its discretion, will deny Plaintiffs' request for a declaration that they possess riparian rights in the waters of Smith Lake because there is no need for it. The dispositive issue for this Court is whether or not Plaintiffs' riparian rights, assuming they possess them, are being unreasonably interfered with by Alabama Power due to its operation of Smith Dam in accordance with its FERC licenses, the issue to which the Court now turns.

### C.    Alabama Power's Motion for Summary Judgment

The primary argument advanced in Alabama Power's motion for summary

judgment is twofold: that all of Plaintiffs' claims are due to be dismissed because 1) even if Plaintiffs possess riparian rights in Smith Lake, Alabama Power has not violated any such rights or committed any of the torts alleged because it has at all relevant times operated Smith Dam in accordance with its 1957 and 2010 FERC Licenses and the Corps Manual, and 2) the FERC has already rejected Plaintiffs' arguments for more stable lake levels and Plaintiffs bring this lawsuit outside of the FPA's exclusive judicial review mechanism. Because the Court finds that these arguments are sufficient to dispose of all of Plaintiffs' claims, the Court's analysis will not go beyond these two interrelated arguments.   The Court will address the arguments in reverse order, because as Alabama Power's second argument is essentially that Plaintiffs brought their claims in an improper forum, the Court should first determine if it has jurisdiction.

1.  *Plaintiffs' Claims Constitute an Impermissible Collateral Attack on Operations the FERC has Sanctioned, after the FERC Considered and Rejected the Same Arguments Plaintiffs Now Make to this Court Outside of the Exclusive Judicial Review Mechanism Mandated by the FPA*

Alabama Power argues that all of Plaintiffs' claims fail because this lawsuit is an impermissible collateral attack on the FERC License, which was issued to Alabama Power after the FERC considered and rejected the same substantive arguments

Plaintiffs now make to this Court.  Deciding whether this argument has merit requires the Court to examine portions of the FPA, the statute that vests the FERC with the authority to issue licenses and to impose conditions on licensees.  *See* 16 U.S.C. §§ 797(e), 803.

Congress's power to control the navigable waters of the United States through enactment of the FPA arises from the Commerce Clause, as "[w]ater power development from dams in navigable streams is . . . a by-product of the general use of the rivers for commerce." *United States v. Appalachian Elec. Power Co.*, 311 U.S. 377, 426 (1940), *superseded by statute on other grounds*. The U.S. Supreme Court has recognized that in enacting the FPA under this authority, "Congress clearly intended a broad federal role in the development and licensing of hydroelectric power." *California v. F.E.R.C.*, 495 U.S. 490, 496 (1990). Indeed, the FPA authorizes the FERC to issue licenses "for the purpose of constructing, operating, and maintaining dams . . . reservoirs, power houses, . . . or other project works necessary or convenient for the development and improvement of navigation and for the development, transmission, and utilization of power across, along, from, or in any of the streams or other bodies of water over which Congress has jurisdiction." 16 U.S.C. § 797(e). The FERC may do so subject to the conditions it deems best suited with respect to a

number of sometimes competing interests and benefits, including "interstate or foreign commerce, . . . water power development, . . . adequate protection, mitigation, and enhancement of fish and wildlife . . . other beneficial public uses, including irrigation, flood control, water supply, and recreational and other purposes . . ." *Id.* at § 803(a).

Importantly, the FERC has exclusive jurisdiction over hydroelectric projects it licenses. *First Iowa Hydro-Elec. Co-op. v. Fed. Power Commission*, 328 U.S. 152, 175-76 (1946). Additionally, the FPA provides that the exclusive mechanism for review of a FERC decision is through the federal courts of appeals:

> Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such in the United States Court of Appeals for any circuit wherein the licensee or public utility to which the order relates is located.

16 U.S.C. § 825*l*(b).

In this case, no matter how their claims are characterized, it is clear that Plaintiffs are seeking more stable water levels at Smith Lake and that they are asking this Court to order Alabama Power to construct cooling towers at Plant Gorgas:

> During certain months of the year, including but not limited to June through December, Alabama Power unreasonably decreases lake levels to such a degree that the Class members are unable to reasonably use or enjoy their property or the waters of Smith Lake. Alabama Power is unreasonably lowering lake levels in order to avoid building necessary

cooling towers at [Plant Gorgas].

. . .

Alabama Power uses the waters of Smith lake in lieu of an appropriate cooling system. At the time of large discharges from the Gorgas Plant, Alabama Power unreasonably releases large flows of water from Smith Lake to cool the Gorgas discharge. During such releases, the Class members' use of their riparian property and the waters of Smith Lake is severely impaired.

. . .

[P]laintiffs request that this Court issue an injunction (a) requiring Alabama Power to construct appropriate and effective cooling towers at the Gorgas Plant and, in so doing, to undertake in good faith all steps and procedures necessary to construct the cooling towers, including obtaining the necessary permits and licenses and complying with all necessary administrative, procedural, and legal requirements . . . .

(Second Amended Complaint, Doc. 96-1, at ¶¶ 19-20, 24, 51.)

There is also no question that these are the same requests for more stable water levels and for cooling towers that their lakefront property owners' association, SLISA, sought during the dam relicensing proceeding before the FERC and the same relief that SLISA sought on rehearing to the FERC.[15] Like Plaintiffs here, SLISA sought to elevate recreational use above all other interests. But Smith Lake was not designed solely for recreational use, as the Corps Manual provides:

Primarily, it is a storage project constructed for the purpose of providing

---

[15] As noted previously, former plaintiff Jared Key and Plaintiff Billings both conceded that Plaintiffs are making substantively the same requests for more stable water levels and for cooling towers that SLISA made before the FERC.

reservoir capacity for the generation of hydro-electric power and for flood control.

. . .

Development for purely recreational purposes is not included among the project features. However, many recreational advantages are inherent in an impoundment of this nature, and special attention has been given to the encouragement of recreational aspects where they do not conflict with major project purposes.

(Doc. 83-1, ¶¶ 13-14.)

The FERC rejected SLISA's proposal in both proceedings, after balancing recreational uses with many other interests:

[FERC] Staff balanced the need for power, flood control, navigation and commerce, water quality, aquatic resources, and recreation. Staff concluded that the project currently provides considerable benefits to recreation around the lake, and these benefits would continue under the staff-recommended project operation. Implementing the operation recommended by the Lake Association [*i.e.*, SLISA] would be excessively costly and provide speculative benefits which may never be realized. Finally, in the EA Staff concluded that the costs of the Lake Association alternative outweighs the benefits, and is not in the overall public interest.

(Doc. 83-1, ¶ 28, Exhibit V.)

Despite the FPA's designated avenue for appealing a FERC decision only to the federal courts of appeals, Plaintiffs filed this lawsuit in Alabama state court, alleging state law tort claims, including violation of riparian rights, and seeking damages and equitable relief.  Plaintiffs assert that this was appropriate under the FPA, because the

FPA also contains a savings clause that preserves the type of state-law riparian rights

they say they possess in Smith Lake and that they are exercising before this Court.

Section 27 of Part I of the FPA provides:

> Nothing in this chapter shall be construed as affecting or intending to affect or in any way to interfere with the laws of the respective States relating to the control, appropriation, use, or distribution of water used in irrigation or for municipal or other uses, or any vested right acquired therein.

16 U.S.C. § 821.

In *Georgia Power Company v. Baker*, the Eleventh Circuit interpreted the savings

clause set forth above, explaining the "continued vitality of state laws" as follows:

"The Supreme Court [held] that as long as the federal government has not exercised

its power to abolish state law riparian rights, those rights survived the passage of the

Act, even if they are within the scope of the government's dominant servitude." 830

F.2d 163, 166 (11th Cir. 1987) (citing *Federal Power Comm'n v. Niagra Mohawk Power

Corp.*, 347 U.S. 239, 252 (1954)). Again quoting the Supreme Court, the Eleventh

Circuit explained:

> The references in the [FPA] to preexisting water rights carry a natural implication that those rights are to survive, at least until taken over by purchase or otherwise. Riparian water rights, like other real property rights, are determined by state law. The Federal Water Power Act merely imposes upon their owners the additional obligation of using them in compliance with that Act.

830 F.2d at 166 (quoting *Niagra*, 347 U.S. at 252). Thus, the *Baker* court held that despite Georgia Power's obligation to operate its power project on Lake Sinclair in compliance with its FERC license, Georgia Power still had water surface rights under state law which would allow it to regulate seaplane usage on the lake. *Id*.

Importantly, however, the *Baker* court held that Georgia Power's state law water surface rights must be exercised in conformity with its FERC license. *Id*. The court thus went on to discuss whether Georgia Power's prohibition of seaplane operations on Lake Sinclair was consistent with the requirements of its FERC license that it allow reasonable public access to the lake, reserving such "facilities" as necessary for the protection of life, health, and property. *Id*. at 167 (although the license required Georgia Power to "allow the public free access, to a reasonable extent, to project waters," it also allowed the licensee to "reserve from public access, such portions of the project waters, adjacent lands, and project facilities as may be necessary for the protection of life, health, and property"). Because the prohibition on seaplanes due to their potential harm to the public was a reasonable limitation on public access to the lake property, the ban was held to be a proper application of Georgia Power's state law rights *exercised in conformity with its FERC license*. *Id*. at 168. *Baker* thus suggests that although the FPA provides a plan for comprehensive federal

regulation of water resources, it does not entirely preempt state riparian rights laws, conditioned on the requirement that these state law rights are used in conformity with federal regulations.

However, Alabama Power argues that the Supreme Court has ruled in other contexts that state tort claims are preempted where a federal agency has ruled on all of the issues upon which the claims are based. *See, e.g., Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 325-326 (1981) (holding that the plaintiff's claims under Iowa law against the defendant railroad for abandonment of a rail line were preempted by the Interstate Commerce Act, which authorized the abandonment). And analogous to the situation here, Alabama Power points out that several courts have held that a party cannot use state tort law to effect a change to a FERC licensing proceeding. A Massachusetts court held that if a FERC license expressly authorizes an action, a plaintiff "cannot use state tort law to prevent [the licensee] from doing something that FERC has sanctioned." *Lowell v. Enel N. Am., Inc.*, 796 F. Supp. 2d 225, 231 (D. Mass. 2011). The court thus held that the plaintiffs' claims of trespass, negligence, and intentional interference with advantageous business relations asserted against the dam operator were preempted because they were based on actions expressly authorized by the FERC, stating: "To effect changes to the

FERC license, [the plaintiffs] must utilize the process established by the FPA [*i.e.*, challenging the FERC license before the federal courts of appeals], not state tort law." *Id.* at 231-32.

Likewise, the Ninth Circuit has twice held that any collateral attacks on the FERC's licensing orders are still governed by the FPA's exclusive judicial review provision. In *Skokomish Indian Tribe v. United States*, 332 F.3d 551 (9th Cir. 2003), the court held that § 825*l*(b) still controls even if a party's claims are couched in a damages action:

> Here, the Tribe does not explicitly seek to modify, rescind, or set aside FERC's licensing order. Rather, the Tribe *artfully pleads* its claims based on the Treaty, 42 U.S.C. § 1983, the Fifth and Fourteenth Amendments, and federal common law as a basis for the district court's jurisdiction. *However, the Tribe's claims flow directly from FERC's licensing order.* The FPA required FERC to make a specific finding that the Project "will not interfere or be inconsistent with the purpose for which any reservation affected thereby was created or acquired." Moreover, the Tribe raised its claims in context of the FERC relicensing proceeding and FERC attached certain conditions to its license to mitigate any harm to the Tribe. *The Tribe is now asking us to find that Tacoma's operation of the Project pursuant to its federal license gives rise to a damages action, which in turn requires us to conclude that FERC erred when it found that the license would not interfere with the purpose for which the reservation was created.* As in *Taxpayers of Tacoma*, the Tribe's claims were raised and addressed in the FERC licensing proceeding, and any dispute over FERC's decision belongs first before FERC and then the circuit courts, not the district courts. Thus, the Tribe's claims are impermissible collateral attacks on FERC's licensing order.

*Skokomish*, 332 F.3d at 560 (emphasis added).

*City of Tacoma v. Taxpayers of Tacoma*, 357 U.S. 320 (1958), the U.S. Supreme Court case on which the Ninth Circuit relies in *Skokomish*, involved a FERC license to the City of Tacoma to construct a power facility on the Cowlitz River, which the FERC granted despite Washington State's contention that the project could not be built without its approval. *Id.* at 323-28. In a separate proceeding, the State appealed the FERC's licensing decision to the Ninth Circuit, which affirmed the FERC. *Id.* at 327-28. At the same time, the City of Tacoma filed a state court action seeking a declaratory judgment that its issue of revenue bonds in connection with the building of that project was valid. *Id.* at 329. The Washington Supreme Court held that the FERC license could not give the City of Tacoma power to condemn state land necessary for the project without specific state legislation. *Id.* On appeal before the U.S. Supreme Court, the City of Tacoma argued that the question had been finally determined by the Court of Appeals in affirming the FERC's decision, and that the State's cross-complaints in the subsequent bond validation suit in the Washington courts had been nothing more than impermissible collateral attacks upon the final judgment of the Court of Appeals. *Id.* at 334. The Court interpreted § 825*l*(b) as follows:

This statute is written in simple words of plain meaning and leaves no room to doubt the congressional purpose and intent. It can hardly be doubted that Congress, acting within its constitutional powers, may prescribe the procedures and conditions under which, and the courts in which, judicial review of administrative orders may be had. . . . So acting, Congress in [§ 825*l*(b)] prescribed the specific, complete and exclusive mode for judicial review of the Commission's orders. . . . *It thereby necessarily precluded de novo litigation between the parties of all issues inhering in the controversy, and all other modes of judicial review.* Hence, upon judicial review of the Commission's order, all objections to the order, to the license it directs to be issued, and to the legal competence of the licensee to execute its terms, must be made in the Court of Appeals or not at all. . . . [E]ven if it might be thought that this issue was not raised in the Court of Appeals, it cannot be doubted that it could and should have been, for that was the court to which Congress had given "exclusive jurisdiction to affirm, modify, or set aside" the [FERC] Commission's order. *And the State may not reserve the point, for another round of piecemeal litigation* . . . .

357 U.S. at 335-37, 339 (internal citations omitted) (emphasis added).  Thus, the State's contentions were impermissible collateral attacks on the FERC's licensing decision.  *Id.* at 341.

Also in *California Save Our Streams Council, Inc. v. Yeutter*, 887 F.2d 908 (9th Cir. 1989), the FERC issued a license to construct and operate a hydroelectric power facility in the Sierra National Forest. After failing to get relief from an administrative review of the FERC's decision, the plaintiffs filed a complaint in district court against the United States Forest Service under the National Environmental Policy Act and the American Indian Religious Freedom Act. *Id.* at 910. The plaintiffs argued that

§825*l*(b) was inapplicable because they were not attacking the licensing decision made by the FERC, but were alleging the failure of the Forest Service to follow necessary procedural steps in statutes outside the purview of the FPA. *Id.* at 911. The court rejected the plaintiffs' argument, holding that the FPA governs review of all disputes concerning the licensing of hydroelectric projects, and that the plaintiffs' action was at its core an attempt to restrain the licensing procedures authorized by the FERC. *Id.* at 912. The court also noted that the plaintiffs' approach would disturb the statutorily-mandated licensing procedure, stating, "The point of creating a special review procedure in the first place is to avoid duplication and inconsistency. It provides a single and expeditious procedure for resolving licensing disputes." *Id.*

In this Court's view, the Eleventh Circuit's holding in *Baker* is not at odds with the results reached in the other aforementioned cases. As noted previously, *Baker* indicates that there is an interplay between federal regulation of hydroelectric projects and state law property rights. For example, Alabama Power's 1957 FERC License obligated it to acquire "all riparian or other rights, the use or possession of which is necessary or appropriate in the maintenance and operation of the project." (Doc. 83-1, at 194-98.) But once an activity is exclusively regulated and sanctioned by a FERC license, an aggrieved party may not use state law tort as a vehicle to interfere with that

sanctioned activity. *See California v. F.E.R.C.*, 495 U.S. 490, 506 (1990) (holding that the FPA preempts state laws where compliance with a state law or regulation would frustrate compliance with the FPA or a FERC license, thus stating that a California requirement for minimum flow was preempted because "FERC set the conditions of the license, including the minimum stream flow, after considering which requirements would best protect wildlife and ensure that the project would be economically feasible, and thus further power development").

In other words, pursuant to *Baker*, a plaintiff may still bring a violation of riparian rights claim in certain situations.  However, if such a claim essentially asks a court to modify the terms of an existing FERC licensing order, the request must be made in the federal courts of appeals or not at all.  That is the case here: even though Plaintiffs do not "explicitly seek to modify, rescind, or set aside FERC's licensing order" in this lawsuit, the suit is nonetheless a collateral attack on the FERC license because it "artfully pleads" claims that "flow directly from FERC's licensing order." *Skokomish*, 332 F.3d at 560. Indeed, Plaintiffs' proposals for different operations that would purportedly result in more stable water levels, in fact, have already been presented to and rejected by the FERC. By requesting the same relief in this lawsuit, Plaintiffs are essentially asking this Court to rule that the FERC license was granted

unreasonably. Under these cases, it does not matter that Plaintiffs also seek monetary damages from the alleged commission of torts in addition to an injunction and a court order to construct cooling towers. In *Skokomish*, because the plaintiffs asked the court "to find that [the defendant's] operation of the Project pursuant to its federal license gives rise to a damages action," the court necessarily would be required "to conclude that FERC erred when it found that the license would not interfere with the [plaintiff's interests]." *Id.* The same is true here.

In sum, Alabama Power's motion for summary judgment is due to be granted because Plaintiffs' claims constitute an impermissible attack on a FERC licensing decision and thus belong only in a federal court of appeals.

    2.    *In the Alternative, Alabama Power's Operation in Compliance with the FERC License is a "Reasonable Use" of its Own Riparian Rights and not Violative of Any Riparian Rights Plaintiffs May Have*

If the Court has misinterpreted the cases set forth above, and Plaintiffs may pursue their state law claims based on alleged violations of riparian rights in this Court despite the FPA's provision requiring challenges to FERC licensing proceedings to be brought only in the federal courts of appeals, all of Plaintiffs' claims nonetheless fail for an entirely independent reason.  Alabama Power argues that Plaintiffs' riparian rights, assuming they have them, are subject to the right of reasonable use of the

waters by other riparian owners, including Alabama Power, and the use of riparian rights on a FERC-licensed project is considered "reasonable" as a matter of law when the FERC licensee is acting in compliance with its FERC license. In support of this contention, Alabama Power relies primarily on three cases in which it was sued by downstream riparian owners alleging misuse of waters on hydroelectric projects: *Beaunit Corp. v. Alabama Power Co.*, 370 F. Supp. 1044 (N.D. Ala. 1973), *Ellis v. Alabama Power Co.*, 431 So. 2d 1242 (Ala. 1983), and *Bryan v. Alabama Power Co.*, 20 So. 3d 108 (Ala. 2009).

In *Beaunit*, the plaintiff corporation owned a textile manufacturing plant several miles downstream from Alabama Power's Logan Martin Dam on the Coosa River. 370 F. Supp at 1045. The plaintiff claimed that Alabama Power's operation of the dam as a peaking power plant, including the raising and lowering of water, caused the flow of the Coosa River past the plaintiff's textile plant downstream to be intermittent, causing damage to the plant. *Id.* at 1049.[16] The court made several findings of fact in the case, including that Alabama Power's operation of Logan Martin Dam as a peaking

---

[16] As part of its operations, the plaintiff's plant continuously pumped waste into the Coosa River, but it was doing so in conformity with the requirements set by the Alabama Water Improvement Commission. After Alabama Power's completion of the dam, the plaintiff was required by the commission to alter its method of waste discharges into the river which involved the construction of a large waste lagoon and appurtenant facilities. This resulted in expenditures by the plaintiff of approximately $650,000.00, which it sought to recover from Alabama Power. *Id.*

power plant in conformity with its FPC (which was the predecessor to the FERC) license and with plans of operation approved by the Corps was "reasonable," and further, that Alabama Power's "use of the Coosa River incident to its operation and maintenance of Logan Martin Dam and its generating facilities is a reasonable use and a reasonable exercise of its riparian rights." *Id.* at 1047. This was because, as the court found, Alabama Power's operation in conformity with the FPC license and Corps' requirements "permits efficient and economic hydroelectric power generation, and also produces a balanced use of the river giving effect to flood control, navigation and recreation, as well as power benefits" and was therefore reasonable. *Id.* at 1049. The court applied Alabama's "reasonable use" doctrine to the plaintiff corporation's nuisance claim, pursuant to which "any right of plaintiff to the flow of river past its lands is subject to and qualified by the right of reasonable use of the rivers by other riparian owners, including [Alabama Power]." *Id.* at 1051. Because the court found that Alabama Power operated Logan Martin Dam reasonably, it held that Alabama Power did not violate any rights of the downstream riparian owner, and thus the downstream riparian owner could not recover a judgment against Alabama Power. *Id.*

Just as in *Beaunit*, the uncontroverted evidence in this case establishes that Alabama Power has at all times operated Smith Dam in accordance with its FERC

License and the Corps' Manual. The Manual that the License requires Alabama Power to follow provides that the area from 488 to 510 feet above msl is "available for normal power operations." Plaintiffs do not dispute this. *See* Plaintiffs' Second Amended Complaint, Doc. 96-1, at ¶ 18 ("Alabama Power has water power storage rights below the 510-foot contour level of the Class members' shoreline property."). The record also includes charts showing the elevation of Smith Lake for each year from 1961 to 2012, which show that Alabama Power has generally operated the Smith Dam project in accordance with the Manual's guide curves from inception. Plaintiffs' disagree, but in recently denying SLISA's request for rehearing, the FERC reiterated that under its license, Alabama Power has discretion in the way it operates Smith Dam: "So long as Alabama Power met these two sets of requirements [flood control and navigation releases], it could operate the Smith development to 'best suit system requirements to obtain maximum energy generation from water available' and did not have to maintain specified lake elevations." (Doc. 83-1, ¶ 32.)  It is thus undisputed that Alabama Power has at all times[17] complied with the FERC licenses' provisions for

---

[17] Plaintiffs do not dispute Alabama Power's contention that the longest statute of limitations for any of Plaintiffs' claims is six years. *See Beaunit*, 370 F. Supp. at 1052 (recognizing that the Supreme Court of Alabama has held the two year statute of limitations in Ala. Code § 6-2-38(l) [formerly one year] to apply to actions brought for interference with riparian rights); Ala. Code § 6-5-127(a) (setting a one year statute of limitations for nuisance claims arising from the operation of an "agricultural, manufacturing or other industrial plant or establishment"); *Auburn Univ. v. Int'l Bus. Mach., Corp.*, 716 F. Supp. 2d 1114, 1118 (M.D. Ala. 2010) (holding unjust enrichment based on

use of waters at 510 feet msl and below, which is where Plaintiffs claim the water is too low. The fact that water used to generate hydropower at Smith Dam is also used to condense steam downstream at Plant Gorgas and to maintain downstream water quality does not violate any provision of the License, and indeed, the fact that Plant Gorgas would benefit from these operations was recognized from the outset. Further, as the court found in *Beaunit*, the FERC, in issuing both the 1957 and 2010 License, found that Alabama Power's operation of Smith Dam "is best adapted to a comprehensive plan for improving and developing the Sipsey Fork of the Black Warrior River and the Black Warrior River for the use and benefit of interstate or foreign commerce, for the improvement and utilization of water-power development, and for other beneficial public uses, including recreational purposes." (Doc. 83-1, at

---

tort and not contract was subject to two-year statute of limitations in Ala. Code § 6-2-38(l)); *Ex parte Capstone Bldg. Corp.*, 96 So. 3d 77, 91 (Ala. 2012) ("[L]itigants whose causes of action accrued on or before June 3, 2011, the date of the original issuance by this Court of its opinion in this case, shall have two years from that date to bring their action, unless and to the extent that the time for filing their action under the six-year limitations period announced in *McKenzie* would expire sooner."). As discussed *infra*, Counts VII and IX of the complaint are remedies, not causes of action. Therefore, they have no separate statutes of limitations. Rather, the statute of limitations for the underlying cause of action applies. *See Alabama v. United States Army Corp of Eng'rs*, 424 F.3d 1117, 1127 (11th Cir. 2005) (quoting *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1097 (11th Cir. 2004)); *see also Gulf States Steel, Inc. v. Lipton*, 765 F. Supp. 696, 704 (N.D. Ala. 1990) (holding that a claim for constructive trust was not a separate cause of action and that plaintiff's request for constructive trust was barred by the statute of limitations for the cause of action on which plaintiff's request was based). "[A]ny motion or suit for either a preliminary or permanent injunction must be based upon a cause of action" and the relevant statute of limitations would be that which is applicable to the underlying cause of action. *United States Army Corp. of Eng'rs,* 424 F.3d at 1127.

¶ 10.)

In attempting to distinguish *Beaunit*, Plaintiffs point out that the court in that case noted that the expert witness called by the plaintiff, and the expert witnesses called by Alabama Power, "were not in conflict regarding the reasonableness and necessity of the defendant's mode of operation of Logan Martin Dam." *See Beaunit*, 370 F. Supp. at 1049.  Here, Plaintiffs say, there are questions of fact concerning whether Alabama Power's use of Smith Lake is reasonable.  More specifically, Plaintiffs say that questions of fact exist as to 1) whether cooling water provided by Smith Lake to Plant Gorgas is incidental to Smith Dam's operation as a peaking plant or whether the need for cooling water at Plant Gorgas drives the operation of Smith Lake during the summer months; 2) whether Alabama Power operates Smith Lake differently than its other lakes by dropping the elevation of the lake much earlier in the year, *i.e.*, in June and July, due to the need for cooling water at Plant Gorgas;  and 3) whether Alabama Power altered its use of the waters at Smith Lake after the filing of the present action, because the water level was generally higher during the summer of 2012 than it had ever been.

However, the FERC, in connection with the relicensing of the Project, considered and rejected SLISA's arguments that the Smith-Gorgas Coordination

procedure implemented by Alabama Power at Smith Lake was unreasonable, which resolved the first two "fact issues" alleged by Plaintiffs.[18] And, at a federally-licensed dam like Smith Dam, a FERC decision is the touchstone for reasonableness because the FERC was specifically charged with balancing the competing interests in Project waters. Indeed, the FERC balanced interests including "interstate or foreign commerce, . . . water power development, . . . adequate protection, mitigation, and enhancement of fish and wildlife . . . other beneficial public uses, including irrigation, flood control, water supply, and recreational and other purposes . . . ." 16 U.S.C. at § 803(a).[19] Importantly, the court deferred to the FERC's balancing in *Beaunit*, even

---

[18] In support of these two alleged fact issues, Plaintiffs cite the declaration of Brian McCrodden, an engineer who was SLISA's expert during the FERC relicensing proceeding, wherein he offered his model as a better way to operate Smith Dam, including constructing cooling towers at Plant Gorgas. The FERC rejected his opinions, and Plaintiffs' attempt to resurrect them conflict with the FERC's findings. As to the third fact issue, it appears irrelevant to the Court that the water level was generally higher during the summer of 2012 considering that Alabama Power has great discretion in how it operates the dam under its FERC license and it is not required to maintain lake levels at a certain height.

[19] Plaintiffs take issue with the FERC's statement in its EA that "the Gorgas Plant is not licensed by [FERC]; therefore, construction of cooling towers at the Gorgas Plant is outside the Commission's jurisdiction." (Doc. 83-2, Exhibit V.) However, the FERC does have exclusive jurisdiction to determine the public interest associated with how Smith Dam should be operated, and it has done so, finding that SLISA's proposals for the construction of cooling towers at Plant Gorgas are not in the public interest. Moreover, Plant Gorgas is licensed by the APSC, which found it to be in the public interest. (Doc. 83-1, ¶ 8.) Because of this, it appears that this Court does not have the authority to order the construction of cooling towers at Plant Gorgas if it wanted to. The Alabama Code provides that the APSC must review the prudence of a public utility's, like Alabama Power's, decisions and that the APSC has exclusive jurisdiction to issue certificates of convenience and necessity to establish rates. *See, e.g.,* Ala. Code §§ 37-1-49, 37-4-28, 37-1-80; *Con't Tel. Co. of the South v. Ala. Public. Serv. Com'n*, 427 So. 2d 981, 987-88 (Ala. 1982). Plaintiffs' request would have

though the plaintiffs had been operating their plant before the dam was ever built, recognizing that "[s]uch method of operation of the dam and its generating facilities [*i.e.*, compliance with a FERC license] is reasonable." *Beaunit*, 370 F. Supp. at 1051. Considering the record developed in this case, *Beaunit* strongly suggests that Alabama Power's actions in operating Smith Dam and lake as it does are a reasonable use of its riparian rights, such that all of Plaintiffs' tort claims, which are each based on an alleged violation of riparian rights, cannot stand.

*Ellis* and *Bryan* provide further support for Alabama Power's position. In *Ellis*, riparian owners on the Coosa River between Lay Dam and Mitchell Dam sued Alabama Power in connection with flooding of their property. 431 So. 2d at 1243. The Alabama Supreme Court framed the issue as "whether [Alabama Power], when it operates its hydroelectric dams in accord with the [FPC] license and the Department of Army regulations, is liable in an action for damages for negligence, trespass and/or nuisance." *Id.* The Court held that operation of a dam in accordance with "the plans and specifications required by the government . . . relieved [Alabama Power] from the

---

the effect of vesting this Court with authorities plainly granted to Alabama Power and to the APSC under those code sections. For example, if the Court were to order the construction of cooling towers, the APSC would be foreclosed from assessing the need for the cooling towers as part of a proceeding for a certificate of convenience and necessity or the costs associate with the cooling towers when any such costs are included in rate base as property of the utility used to serve the public.

creation and maintenance of a nuisance." *Id.* at 1245 (quoting *Burnett v. Ala. Power Co.*, 74 So. 459, 467 (Ala. 1916) (holding that Alabama Power was not liable for flood damage in its operation of a dam across a navigable waterway)). The court further held that "there could be no negligence in doing the thing so sanctioned [by the federal government]." *Id.* (quoting *Burnett*, 74 So. at 467-68).

In *Bryan*, the plaintiff farmers owned property on the Tallapoosa River, downstream from Martin Dam, which is operated by Alabama Power under a FERC license. 20 So. 3d at 110. The downstream riparian owners claimed that Alabama Power was negligent and wanton in its operation of Martin Dam during flood events in 2003, thus causing damage to their properties. *Id.* The case turned on whether the downstream riparians could prove that Alabama Power owed them a duty and, if so, whether they breached that duty, because duty was an element of both their negligence and wantonness claims. *Id.* at 115-16. In holding that Alabama Power did not breach a duty to downstream riparian owners, the Alabama Supreme Court relied on its previous holding in *Ellis*, stating that there the court found "uncontradicted evidence of compliance with federal regulations to be incompatible with a claim of breach of duty to a lower riparian owner." *Id.* at 116-17 (citing *Ellis*, 431 So. 2d at 1246). The court likened *Bryan* to *Ellis* insofar as in both cases the dams at issue were

subject to federal regulations:

> For example, the operating curve of the 1978 FERC license for Martin Dam specified that Alabama Power was to maintain the lake level between 489 and 490 feet. Additionally, the FERC licenses specified that during flood periods Alabama Power was not to operate Martin Dam with a rate of outflow greater than the concurrent rate of inflow. Furthermore, the FERC licenses required Alabama Power to communicate and coordinate with the Corps of Engineers with respect to its flood-control operations. The record shows that the FERC licenses govern many other aspects of Alabama Power's operation of Martin Dam as well. In light of the extensive federal involvement in Alabama Power's operation of Martin Dam via the FERC licenses, it is apparent that Martin Dam is part of a general scheme of federal coordination and regulation of navigable waterways, including coordination with the Corps of Engineers.

*Id.* at 117. The court further found in *Bryan* that, as in *Ellis*, Alabama Power complied with its FERC license during the floods at issue by maintaining lake levels within the operative curve; thus its operation of Martin Dam was not negligent. *Id.* at 118. In so holding and thus granting summary judgment for Alabama Power, the Alabama Supreme Court further emphasized that it would not impose a legal duty beyond the requirements of the FERC license for a hydroelectric project:

> In so concluding, we are mindful of the fact that operating Martin Dam to attain such storage would require Alabama Power to maintain a lake level below the operating curve established by the FERC and approved by the Corps of Engineers. We are also mindful of the delicate balancing of interests between upstream and downstream landowners along the Tallapoosa River basin. The balancing of those interests is subject to federal regulations and has been challenged, negotiated, and agreed upon

by various individuals and entities during the last several decades. The farmers have not presented adequate authority justifying this Court's interference with the regulation and previous balancing of such interests.

*Id*. at 119.[20]

Plaintiffs attempt to distinguish *Bryan* on its facts, emphasizing that it was limited to duties that dam operators owe to prevent or limit flooding on the property of downstream owners regarding causing or worsening of flooding, not an alleged interference with riparian rights, at issue here. *See Bryan*, 20 So. 3d at 116-18. The Court does not find that fact to be a material point of distinction between this action and *Bryan*. As in *Bryan*, Plaintiffs here sue Alabama Power for wantonness in its operation of Smith Dam, a cause of action which necessitates a finding of breach of a duty under Alabama law. *See Bryan*, 20 So. 3d at 115-116.

The claims raised by the plaintiffs in *Beaunit*, *Ellis*, and *Bryan* are the same as the claims Plaintiffs assert here: Count II (violation of riparian rights); Count III (private nuisance); and Count VII (wantonness). Yet in *Beaunit*, *Ellis*, and *Bryan*, Alabama courts held that these tort claims of other riparian owners—to which Plaintiffs have analogized themselves in this case—could not stand in light of Alabama

---

[20] As in this case, in *Bryan*, a group of landowners had intervened in the FERC's re-licensing of Martin Dam, objecting to the operation of the dam in a manner that would allow high lake levels during rainy seasons. The landowners' proposals were rejected by the FERC as not in the public interest. *Id*. at 111.

Power's operation of hydroelectric projects in accord with federal regulations. *See Beaunit*, 370 F. Supp. at 1051 (holding that Alabama Power did not violate downstream riparian owner's riparian rights because "[s]uch method of operation of the dam and its generating facilities [in accordance with its FPC License] is reasonable"); *Ellis*, 431 So. 2d at 1245 (holding that operation of a dam in accordance with "the plans and specifications required by the government . . . relieved [Alabama Power] from the creation and maintenance of a nuisance") (quoting *Burnett*, 74 So. at 467); *Bryan*, 20 So. 3d at 116-17 (holding that plaintiff's negligence and wantonness claims failed because "uncontradicted evidence of compliance with federal regulations [is] incompatible with a claim of breach of duty to a lower riparian owner").

These cases persuade the Court that Alabama law respects the balance struck by federal law, regulation, and licensing in this area such that a FERC licensee is not liable for doing the very thing permitted by the license. *See Ellis*, 431 So. 2d at 1245. In other words, Alabama's common law defers to the superior expertise of regulatory agencies and is modest enough not to place courts in charge of operating federally-licensed hydroelectric dams.  Indeed, Plaintiffs cite no authority for what they are asking this Court to do—which is have a jury decide that the FERC's approved operations are not reasonable and award damages and enjoin operation

pursuant to a FERC license, effectively overruling the FERC outside the exclusive judicial review provisions of the FPA and substituting this Court's own view of reasonable dam operations. In asking the Court to require a fundamental change in the mode of operation of Smith Dam over the last fifty years, Plaintiffs would have the Court overturn the FERC's careful balancing of competing interests in the waters of Smith Lake. Yet the Court cannot ignore that Alabama Power created Smith Lake for the principal purpose of generating electricity and that the FERC and the Corps approved the very operations about which Plaintiffs complain.[21]

In sum, because Alabama Power has at all times operated Smith Dam in accordance with its FERC License and the Corps' Manual, its exercise of its own riparian rights on Smith Lake is reasonable, and it has thus not violated any such rights of Plaintiffs, nor has it committed any of the torts flowing from the alleged violation of riparian rights.[22] As such, Alabama Power's motion for summary judgment is due

---

[21] Plaintiffs warn that if the Court grants summary judgment in favor of Alabama Power, state common law rights would cease to exist and common law remedies would vanish whenever an activity is subject to federal regulation. The Court does not agree with Plaintiffs' broad characterization of its holding today. There may be a case, coming before a court upon different facts, in which a FERC-licensee may indeed be liable for common law torts associated with its operation of a FERC-licensed project, because it, among other things, violated its FERC license or otherwise acted improperly. This is not that case.

[22] In addition to violation of riparian rights, nuisance, and wantonness, Plaintiffs also allege in Count IV of their complaint that Alabama Power was unjustly enriched by its violation of Plaintiffs' riparian rights. As the violation of riparian rights claim fails in light of *Beaunit* and other aforementioned cases, so too does the unjust enrichment claim. Finally, because Alabama Power is

to be granted as to all of Plaintiffs' claims.[23] All other claims being thus disposed of, Plaintiffs' motion for summary judgment as to the request for a declaratory judgment of riparian rights is due to be denied as merely advisory, as explained more fully in part IV.B, *supra*.

## V.    Conclusion

For the foregoing reasons, no genuine issues of material fact are present and thus Alabama Power's Motion for Summary Judgment (Doc. 81) is due to be granted. Plaintiffs' Cross Motion for Partial Summary Judgment (Doc. 89) is due to be denied. A separate order will be entered consistent with this Opinion.

Done this 9th day of May 2013.

---

entitled to summary judgment on the underlying tort claims, it is also entitled to summary judgment on the remedies Plaintiffs seek through Count V (Action for Constructive Trust) and Count VI (Action for Injunctive Relief). *See U.S. Army Corps of Eng'rs*, 424 F.3d at 1127 ("There is no such thing as a suit for a traditional injunction in the abstract. For a traditional injunction to even be theoretically available, a plaintiff must be able to articulate a basis for relief that would withstand scrutiny under Fed. R. Civ. P. 12(b)(6) (failure to state a claim). . . . [I]f the plaintiff's rights have not been violated, he is not entitled to any relief, injunctive or otherwise.") (quoting *Klay*, 376 F.3d at 1097-98).

[23] Because the Court holds as it does, it need not discuss Alabama Power's alternative arguments that 1) Plaintiffs do not have riparian rights in Smith Lake because Alabama Power acquired any that existed pursuant to language in the deeds and condemnation orders that Plaintiffs' predecessors-in-interest granted to Alabama Power, and/or 2) that all of Plaintiffs' claims fail because the Otwells' and Billings' properties are subject to exculpatory clauses exonerating Alabama Power for any consequences and damages caused by its operation of Smith Dam and Alabama Power's power plants.

L. Scott Coogler
United States District Judge

[160704]